# SEKOU SOUMANA TRAORE *v.* STATE OF MARYLAND

[No. 27, September Term, 1980.]

*Decided July 1, 1981.*

586

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*George E. Burns, Jr., Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Bonnie A. Travieso, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

ELDRIDGE, J., delivered the opinion of the Court.

From 1790 to 1978 this country granted broad criminal and civil immunity for any foreign ambassador or minister and his domestic servants, 22 U.S.C. § 252 (1976).[1] Effective December 29, 1978, Congress repealed this statute and allowed the Vienna Convention on Diplomatic Relations and

---

1. The now-repealed 22 U.S.C. § 252 provided:

"§ 252. Suits against ministers and their domestics prohibited: Whenever any writ or process is sued out or prosecuted by any person in any court of the United States, or of a State, or by any judge or justice, whereby the person of any public minister of any foreign prince or State, authorized and received as such by the President, or any domestic or domestic servant of any such minister, is arrested or imprisoned, or his goods or chattels are distrained, seized, or attached, such writ or process shall be deemed void."

Optional Protocol on Disputes ("Vienna Convention") to govern the matter of diplomatic immunity.[2] The Vienna Convention provides a much narrower scope for diplomatic immunity, including, *inter alia,* the provision that service staff employees have immunity only for acts performed in the course of their official duties.[3] The issue in the instant case is whether an embassy employee may be criminally prosecuted subsequent to the 1978 change in federal law for an act conceded to be outside the scope of his employment but which act occurred while the sweeping diplomatic immunity provisions of the now-repealed 22 U.S.C. § 252 were still in effect.

There is no factual dispute in this case. The petitioner, Sekou Soumana Traore, was indicted on December 13, 1978, and again on May 23, 1979, on charges of child abuse and assault and battery arising out of a single incident occurring in October 1978. These indictments were consolidated. Traore moved to dismiss the charges on the ground that his employment with the French Embassy made him immune from prosecution. A letter from the State Department dated April 30, 1979, informed the court that Traore had been employed by the embassy at all times in question, and that he was entitled to diplomatic immunity until December 29, 1978. The letter went on to indicate that the change in the diplomatic immunity law, effective December 29, 1978, rendered Traore subject to the jurisdiction of the court for an act occurring prior to December 29, 1978. Despite the State

---

**2.** The Vienna Convention became effective in this country in 1972, years before the repeal of 22 U.S.C. § 252 in 1978. The Convention's diplomatic immunity provisions, however, merely set forth minimum standards, permitting a signatory to adopt broader ones. Thus the broad immunity under 22 U.S.C. § 252 continued in force until the repeal of that statute in 1978.

**3.** The relevant portion of the Vienna Convention is found in Art. 37:

"3. Members of the service staff of the mission who are not nationals of or permanently resident in the receiving State shall enjoy immunity in respect of acts performed in the course of their duties, exemption from dues and taxes on the emoluments they receive by reason of their employment and the exemption contained in Article 33."

23 U.S.T. 3227, 3244 (1972).

Department letter, the Circuit Court for Prince George's County granted Traore's motion to dismiss based upon diplomatic immunity.

The State appealed to the Court of Special Appeals, contending that all questions of diplomatic immunity were political questions, and thus the circuit court had erred in granting Traore's motion when the Department of State had indicated he was subject to prosecution. In an unreported opinion, the Court of Special Appeals adopted this approach. The intermediate appellate court held that the State Department letter was controlling and that the circuit court had no authority to deviate from the State Department's conclusion. The order dismissing the charges against Traore was vacated, the indictment reinstated and the case remanded for further proceedings.

Traore petitioned this Court for a writ of certiorari, presenting the following question: "Did the trial judge properly refuse to apply the diplomatic immunity clause of the Diplomatic Relations Act retroactively?" The defendant, in addition to challenging the holding of the Court of Special Appeals, advances two arguments in support of the trial court's action. First, he maintains that Congress did not intend that the 1978 statute have any retroactive effect. Second, he argues that a construction of the statute, permitting subsequent prosecution for acts that could not have been prosecuted when committed, would violate the prohibition against bills of attainder and ex post facto laws contained in the United States Constitution, Article I, § 9, cl. 3. In light of our disposition of the case, however, it will be unnecessary to address the defendant's constitutional arguments.

(1)

First we must consider whether the Court of Special Appeals correctly held that the State Department letter of April 30, 1979, is determinative of the issue in this case. The pertinent portion of the letter, written by the Deputy Chief of Protocol, states:

"From June 16, 1976, to December 29, 1978, Mr. Traore was immune from criminal, civil and administrative jurisdiction under the then existing statutory immunity provisions, 22 U.S.C. 252-254. On December 29, 1978, the provisions of the Diplomatic Relations Act (PL 95-393) became operative, repealing the statutory provisions cited above and establishing the Vienna Convention on Diplomatic Relations as U.S. law respecting the immunity of mission members. Thus, in view of his assignment as a 'service staff' member on December 29, 1978, Mr. Traore now enjoys immunity only in respect of acts performed in the course of his duties in accordance with the provisions of Article 37(3) of the Vienna Convention. Also, respecting any criminal act, or other act giving rise to legal liability, occurring during the period when Mr. Traore enjoyed full immunity, he enjoys immunity from jurisdiction at this time only to the extent such act qualified as one arising in the course of performance of his official functions."

It is settled that the State Department's determinations concerning an individual's diplomatic *status* at a particular time should ordinarily be accepted by the courts. *In re Baiz,* 135 U.S. 403, 10 S. Ct. 854, 34 L. Ed. 222 (1890); *Haley v. State,* 200 Md. 72, 82-84, 88 A.2d 312 (1952). Thus, the State Department's determination that from June 16, 1976, to December 29, 1978, the defendant Traore's status entitled him to immunity from criminal and civil liability should be respected by the judiciary. Similarly, if the State Department had made a contrary determination, that Mr. Traore was not entitled to immunity during the same period because of his diplomatic status during that period, such determination would ordinarily be deemed conclusive.

The State Department's letter in this case, however, went beyond a certification of an individual's diplomatic status at a particular time. The final sentence of the State Department's letter took the position that the repeal of 22 U.S.C.

§ 252 operated retroactively, so that an act by a mission employee, occurring prior to December 29, 1978, when the employee "enjoyed full immunity," could "at this time" be the subject of criminal prosecution or legal liability if the act did not arise in the course of performance of official functions. In short, the State Department not only ruled upon defendant's diplomatic status but also stated a conclusion of law about the effect of congressional action in repealing the old diplomatic immunity statute. Whether the repeal of the 1790 statute subjects the defendant to the court's jurisdiction for acts occurring while he was immune from suit involves questions of statutory interpretation and constitutionality.

In treating as conclusive the State Department's views on the retroactivity of the 1978 statute, the Court of Special Appeals stated that *Haley v. State, supra,* 200 Md. 72, was controlling. *Haley,* however, did not involve the effect to be accorded the State Department's position on issues of statutory construction and constitutionality. The issue in *Haley* concerned the factual status of the defendant at the time he committed the alleged criminal act. In that case, a letter to the court from the Swedish Embassy stated that, during the period when the act was committed, the defendant was an American citizen employed as the personal servant of the Air Attache of the Swedish Embassy in Washington, D.C. Apparently no communication from the State Department was available to the trial court. However, a letter from the State Department to this Court represented that "[t]he Swedish Ambassador has not notified the Department of State officially that Mr. Haley is so employed and the Secretary of State has not, therefore, transmitted his name to the Marshal of the District of Columbia in accordance with provisions of law as set forth in Sections 252-254, Title 22, United States Code." *Id.* at 79. The State Department's letter went on: "Under these circumstances the Department of State is of the opinion that Carl Haley does not have immunity . . . for the reason that there has been no official notification to the United States of any diplomatic status. . . ." (*Ibid.*) Relying upon *In re Baiz, supra,* 135 U.S. 403, this Court in

*Haley* held that the State Department's letter was determinative of the defendant's status. Nothing in the *Haley* case suggests that the State Department's position on the effect of congressional enactments is binding upon the courts. On the contrary, in that case the Court itself construed some of the applicable federal statutes, 200 Md. at 79-82.

*In re Baiz,* relied on by this Court in *Haley,* is the leading case dealing with diplomatic immunity. The issue in that case was also whether the defendant had the *status* of a public minister at the time of the act giving rise to the litigation. The Supreme Court, quoting from earlier cases, pointed out that the certificate of the Secretary of State "is the best evidence to prove the diplomatic character of the person," 135 U.S. at 421. The Court concluded (*id.* at 432):

> "[W]e do not assume to sit in judgment upon the decision of the executive in reference to the public character of a person claiming to be a foreign minister, and therefore have the right to accept the certificate of the State Department that a party is or is not a privileged person, and cannot properly be asked to proceed upon argumentative or collateral proof. . . ."

Although it held that the State Department's position regarding the status of the person claiming to be a foreign minister should be accepted, the Court in *Baiz* construed for itself the underlying statutory provisions and case law concerning what constitutes a "public minister" exercising "diplomatic functions." *Id.* at 422-425.

A principal reason underlying judicial deference to the executive branch of the federal government in certain matters involving foreign governments is the principle that courts should "not so exercise their jurisdiction . . . as to embarrass the executive arm of the Government in conducting foreign relations." *Ex parte Republic of Peru,* 318 U.S. 578, 588, 63 S. Ct. 793, 799, 87 L. Ed. 1014 (1943). *See Alfred Dunhill of London, Inc. v. Cuba,* 425 U.S. 682, 697, 96 S. Ct. 1854, 1862-1863, 48 L. Ed. 2d 301 (1976); *Banco*

*Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 428-433, 84 S. Ct. 923, 940-943, 11 L. Ed. 2d 804 (1964). There are, however, well established limitations to this principle. *Baker v. Carr,* 369 U.S. 186, 211-213, 82 S. Ct. 691, 707-708, 7 L. Ed. 2d 663 (1962) (setting forth various examples of such limitations, including limits upon the concept that the executive determines a person's status as representative of a foreign government, *id.* at 213). One limitation is when Congress has acted with respect to a particular matter, and the issues in litigation concern the authority of Congress to so act and the interpretation or scope of the legislative enactment. These are issues to be resolved by the judiciary. *Vermilya-Brown Co. v. Connell,* 335 U.S. 377, 380-385, 69 S. Ct. 140, 142-145, 93 L. Ed. 76 (1948), *See also Baker v. Carr, supra,* 369 U.S. at 212.

Consequently, whether Congress intended the December 29, 1978, statute to apply to acts committed before that date, and the constitutionality of such application, are issues for resolution by the judiciary, and ultimately the Supreme Court. The State Department's position on these issues is not binding upon the courts.

(2)

The threshold question in determining the applicability of the Diplomatic Relations Act of 1978 to acts occurring before December 29, 1978, is whether Congress intended such retrospective operation of the statute. The Diplomatic Relations Act of 1978, Pub. L. 95-393, 92 Stat. 808, was designed to complement the Vienna Convention on Diplomatic Relations. In addition to repealing 22 U.S.C. §§ 252-254, the Act defined certain terms employed by the Convention, implemented a requirement that diplomats carry liability insurance for operation of motor vehicles, provided procedural rules for dismissing suits against protected parties and for bringing suits directly against insurance carriers, and enunciated new jurisdictional rules to be applied in certain instances.

The Act did not expressly state that its application was to be either retroactive or prospective only. The only explicit reference in the text of the statute to its temporal effect is contained in Section 9: "This Act shall take effect at the end of the ninety-day period beginning on the date of its enactment [September 30, 1978]." To the extent that this language provides any indication of congressional intent, it favors a purely prospective application. The express delay provision indicates that Congress actually considered when the statute should take effect and decided on a date in the future. Under these circumstances, the absence of a retrospective provision suggests a conscious intent that the statute was to be entirely prospective in operation, from and after the specified future date. Moreover, if the statute was intended to be retroactive, there would have been little or no purpose for the ninety-day delay in the effective date.

Another indication of intent in the text of the statute is found in § 6, codified at 22 U.S.C. § 254e. This section requires members of diplomatic missions and their families to comply with regulations requiring liability insurance for the operation of motor vehicles, vessels or aircraft. Since insurance operates to protect one from liabilities that may be incurred in the future, rather than to absolve one of liability for past acts, the mandatory insurance provisions of § 6 of the Diplomatic Relations Act also support a prospective application for the Act.

There is a general presumption in the law that an enactment is intended to have purely prospective effect. In the absence of clear legislative intent to the contrary, a statute is not given retrospective effect. *Claridge Apartments v. Comm'r,* 323 U.S. 141, 164, 65 S. Ct. 172, 185, 89 L. Ed. 139 (1944); *Murray v. Gibson,* 15 How. 421, 423, 14 L. Ed. 755 (1853); *see St. Comm'n On Human Rel. v. Amecom Div.,* 278 Md. 120, 123-124, 369 A.2d 1 (1976); *Kastendike v. Baltimore Ass'n,* 267 Md. 389, 395-396, 297 A.2d 745 (1972), and cases cited therein. In examining both the statutory language and the legislative history, this presumption must be considered to determine whether there are sufficient indi-

cia of a contrary legislative intent. The statutory language, rather than providing indicia of intended retrospectivity, clearly suggests an intent that the statute apply only to future acts.

The legislative history of the Diplomatic Relations Act of 1978 does not demonstrate a congressional intent that the Act apply retroactively. Instead, the legislative history is inconclusive, with some statements arguably supporting a purely prospective application and other statements arguably suggesting a contrary intent. The pervasive theme running throughout hearings on the various bills dealing with diplomatic immunity, which were pending in Congress during 1977 and 1978, is protection for United States citizens against claims of diplomatic immunity raised in a civil context. The legislative history refers to several traffic accidents that had occurred in which United States citizens were severely injured by vehicles driven by diplomatic personnel. Under the law then in effect, the accident victims were left without redress when the defendants successfully invoked the diplomatic immunity privilege. *See, e.g., Claims Against Persons Entitled to Diplomatic Immunity: Hearings on H.R. 7679 Before the House Committee on the Judiciary,* 95th Cong., 1st Sess. (1977), at 31-32; *Diplomatic Privileges and Immunities: Hearings and Markup Before the Subcommittee on International Operations of the House Committee on International Relations,* 95th Cong., 1st Sess. (1977), at 39, 76-83. Many of the discussions by members of Congress and witnesses emphasized the need for urgency in enacting a statute, in order that there would be "fair treatment" to Americans who have suffered injuries and in order that "yet another tragic incident" without a tort remedy would not occur. *E.g., Diplomatic Immunity: Hearing Before the Subcommittee on Citizens' and Shareholders' Rights and Remedies of the Senate Committee on the Judiciary,* 95th Cong., 2nd Sess. (1978) (Statement of Rep. Fisher, co-sponsor of bill in the House), at 25-27. *See also Hearings on H.R. 7679 Before the House Committee on the Judiciary, supra,* at 5; *Hearings and Markup Before the Subcommittee on International Operations of the House*

*Committee on International Relations, supra,* at 180;
*Hearings on Diplomatic Immunity Legislation, Senate Com-
mittee on Foreign Relations,* 95th Cong., 2nd Sess. (1978), at
8. The stress upon prompt enactment, so that there would
not be another tortious accident caused by diplomatic
personnel, leaving the victim without a remedy, arguably
suggests that those members of Congress advocating the
legislation contemplated that it would operate only
prospectively. Otherwise, if an accident occurred prior to
passage, it would still be covered as long as the Act was
passed before the running of limitations.

The discussion in connection with the 90-day delay in the
effective date also possibly suggests that the Act was to
operate only prospectively. The purpose, as disclosed by the
statements at the markup session before the Subcommittee
on International Operations of the House Committee on
International Relations (*Hearings and Markup, supra,* pp.
159-160), was to give the State Department time to promul-
gate new rules and regulations, including insurance regu-
lations; to allow time for the State Department to notify the
diplomatic community; and to allow time for comment upon
the proposed regulations including comment by the insur-
ance industry. As insurance would undoubtedly be purely
prospective, this discussion seems to negate an intent that
the Act be retroactive. In addition, one State Department
official commented at the markup session that "we ought to
have some time to notify the missions [that] these pending
cases will have to be resolved and these individuals will be
subject to jurisdiction henceforth." *Ibid.* Although not
entirely clear, this statement suggests that a purely
prospective operation for the statute was being
contemplated.

In its brief in the present case, the State, in arguing that
the Act was intended to apply retroactively, relies upon
comments by the Chief of the Foreign Litigation Unit of the
Department of Justice. An earlier draft of the bill had
specifically provided that it would not affect any suit or
proceeding which occurred before the repeal. The Depart-
ment of Justice official argued that because the bill was

remedial, it should be retroactive, and he relied upon an English statute which narrowed diplomatic immunity and which was applied retroactively in a civil case. The Justice Department official believed that the wording of the earlier draft "might well make the act prospective only" and he believed that the legislation should "provide that civil actions should be allowed to be brought . . . even though the cause of action may have arisen prior to the enactment of the statute." *Hearings and Markup Before the Subcommittee on International Operations of the House Committee on International Relations, supra,* at 93-94, 99-100 (statement of Bruno Ristau). This testimony before one subcommittee falls short of establishing a congressional intent that the statute broadly operate retroactively. The comments and suggestions of the Department of Justice official related solely to civil actions. More importantly, the subcommittee did not fully accept the official's recommendation. Although it deleted the criticized language, the subcommittee did not adopt the suggestion that the legislation expressly provide that suits should be allowed to be brought even though the cause of action arose prior to enactment. Instead, the final product was silent on this point.

The legislative history of the Diplomatic Relations Act of 1978 was reviewed in the only reported case dealing with the issue of retrospectivity of that Act, *Windsor v. State Farm Insurance Company,* 509 F. Supp. 342 (D.D.C. 1981). In *Windsor,* a plaintiff injured in a traffic accident brought suit directly against the insurance carrier for the driver of the other car, who was a diplomat. This procedure was authorized by Section 7 of the Diplomatic Relations Act. The accident involved, however, had taken place nearly two years before the effective date of the 1978 enactment. The defendant insurance company filed a motion to dismiss, contending that the Act was prospective only and thus did not authorize direct suit for liability incurred prior to its passage. After examining both the statutory language and the legislative history, Judge Sirica for the United States District Court found that there was no clear indication that the enactment was intended to be retroactive. Relying upon

this, and the presumption in favor of a purely prospective application, the court granted the defendant's motion to dismiss. No appeal was taken from this ruling.

We agree with Judge Sirica's conclusion in the District of Columbia case that the Diplomatic Relations Act of 1978 should not be construed so as to operate retroactively. This result is supported by the wording of the Act and the presumption against retroactivity. It is consistent with the legislative history of the statute. In addition, in light of the District of Columbia case, this result will help promote uniformity in the Washington metropolitan area.

> *Judgment of the Court of Special Appeals reversed and case remanded to that court with instructions to affirm the judgment of the circuit court.*
> *Respondent to pay costs.*